UNITED STATES of America, Appellee,

v.

Claudette ATKINS, Appellant.

No. 93–2874.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 8, 1993.

Decided June 3, 1994.

Robert J. Thomas, Jr., St. Louis, MO, argued, for appellant.

Steven A. Muchnick, St. Louis, MO, argued, for appellee.

Before HANSEN, Circuit Judge, JOHN R. GIBSON,* Senior Circuit Judge, and MELLOY,** Chief District Judge.

---

* The HONORABLE JOHN R. GIBSON was Circuit Judge of the United States Court of Appeals for the Eighth Circuit at the time this case was submitted, and took senior status on January 1, 1994, before the opinion was filed.

** The HONORABLE MICHAEL J. MELLOY, Chief Judge of the United States District Court for the Northern District of Iowa, sitting by designation.

MELLOY, Chief District Judge.

Appellant Claudette Atkins was found guilty of one count of conspiracy to defraud the United States Department of Treasury and its agency, the Internal Revenue Service, by obtaining and aiding to obtain the payment of false, fictitious and fraudulent claims, a violation of 18 U.S.C. § 286, and guilty of four counts of making and presenting false, fictitious and fraudulent claims to the United States Department of Treasury, a violation of 18 U.S.C. § 287. Her co-Defendant, Sarah Harris, was also found guilty of one count of conspiracy to defraud the government by obtaining payment through false claims, and guilty of five counts of making and presenting false claims to the United States Department of Treasury. Atkins was sentenced to 21 months.

Atkins raises the following issues on appeal: 1) whether it was proper for the district court [1] to attribute thirty falsified income tax returns to Atkins in computing Atkins' base offense level; 2) whether it was proper for the district court to deny Atkins' motion for downward departure on the ground that Atkins' crime was not a single act of aberrant behavior; and 3) whether the government met its burden of providing a race-neutral explanation for its strikes of black jurors. We affirm on all issues.

## I. Facts

The facts of this case reveal that Atkins and Harris entered into a conspiracy to defraud the Internal Revenue Service (the "IRS") through use of the IRS's electronic tax return network. Atkins or Harris would recruit someone, usually a neighbor, friend, or family member, to pose as a taxpayer. Then, either Atkins or Harris would take the person down to the Johnson Real Estate Office where Atkins worked. At the office, either Atkins or Harris would create fraudulent W-2's for the person on a typewriter in the office. All of the W-2's listed the Fish'N'Such, a company owned by Harris that burned to the ground in 1991, as the employer. Atkins or Harris would then drive the person down to a local H & R Block office where a tax return would be prepared

and electronically filed. Since the person was "entitled" to a refund, an application for a Rapid Refund Loan would also be submitted. A few days later, after the loan check arrived at the H & R Block office, Atkins or Harris would drive the person down to the H & R Block office to pick up their check. The check would then be picked up and endorsed over to Harris. The person filing the return received between one-hundred and three-hundred dollars.

## II. Discussion

### A. Offense Level

Atkins first argues that a preponderance of the evidence only supports a 2 level increase in her base offense level, not the 5 level increase recommended by the probation office and accepted by the district court. *See* U.S.S.G. § 2F1.1(b)(1). In so arguing, Atkins admits that a preponderance of the evidence links her to four of the fraudulent tax returns, i.e., the returns filed by LaTasha Nelson, LaRhonda Nelson, Stanley Johnson, and Pernal Mozee. Atkins disputes, however, whether the evidence links her to the other twenty-six returns which were filed. Based on the evidence presented at trial, the district court concluded that all thirty returns were filed in furtherance of the conspiracy. As a result, the district court attributed all thirty returns (for a total of $57,902) to Atkins.

We review a sentencing court's factual findings for clear error and will reverse the sentencing court if, and only if, we are "left with the definite and firm conviction that the sentencing court erred." *United States v. Garrido*, 995 F.2d 808, 812 (8th Cir.), *cert. denied*, —— U.S. ——, 114 S.Ct. 331, 126 L.Ed.2d 276 (1993). Atkins can only be linked to the thirty returns (for sentencing purposes) if the filing of the returns were "reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense...." U.S.S.G. § 1B1.3(a)(1)(B).

---

**1.** The Honorable Jean C. Hamilton, District Court Judge for the Eastern District of Missouri.

In this case, the evidence showed that Atkins was involved in the conspiracy at all levels. Atkins recruited others to file fraudulent tax returns; she gave the individuals instructions on how to file fraudulent returns; she obtained personal information from the individuals; she prepared fraudulent W-2's [2]; she told one individual what to tell H & R Block if they asked why her W-2 was not typed; she went with at least two of the individuals when they filed their false returns; and she was compensated for her role in the conspiracy. The evidence also showed that the Johnson Real Estate Office served as the headquarters for the conspiracy; that Atkins worked at the Johnson Real Estate Office; that Atkins' brother, Virgil Johnson, Jr., owned the Johnson Real Estate Office; and that numerous friends and family members of Atkins filed fraudulent returns. As for the returns themselves, thirty returns listed the Fish'N'Such as their employer; twenty-eight claimed head of household status; and twenty-three claimed an extra credit for a child born in 1991. When viewed in the aggregate, these facts support the district court's decision to attribute all of the returns to Atkins. The close working relationship between Harris and Atkins, and the similarities between all 30 fraudulent returns, leads us to the conclusion that the full extent of the conspiracy was reasonably foreseeable to Atkins. *See, e.g., United States v. Granados,* 962 F.2d 767, 771 (8th Cir.1992) (close working relationship between co-conspirators provides a strong indication that each co-conspirator knew the full scope of the conspiracy); *United States v. Rowe,* 911 F.2d 50, 51 (8th Cir.1990) (same).

Accordingly, we affirm the district court's finding that all thirty returns should be attributed to Atkins.

### B. Downward Departure

Atkins next argues that the district court should have granted her motion for a downward departure since, according to Atkins, her crime was a single act of aberrant behavior. Pointing to certain statements made by the district court during sentencing, Atkins further argues that the district court would have departed downward but for the district court's mistaken belief that it lacked the authority to depart. In response, and construing these same statements, the government argues that the district court's refusal to depart was based on the facts of the case which show that Atkins' crime was not a single act of aberrant behavior.

We can only review a district court's refusal to depart downward if the district court mistakenly believed that it lacked the authority to depart. *United States v. Bieri,* 21 F.3d 811, 817 (8th Cir.1994); *United States v. Parham,* 16 F.3d 844, 847 (8th Cir.1994); *United States v. Hall,* 7 F.3d 1394, 1396 (8th Cir.1993); *United States v. Evidente,* 894 F.2d 1000, 1005 (8th Cir.), *cert. denied,* 495 U.S. 922, 110 S.Ct. 1956, 109 L.Ed.2d 318 (1990). In this case, we conclude that the district court was aware of its authority to depart, but refused to depart based on the facts of the case.

Specifically, the following statements by the district court demonstrate to us that the district court's refusal to depart was based on a consideration of the facts of the case which showed that Atkins' crime was non-spontaneous and pre-planned:

> I'm going to deny the motion for downward departure. I agree with [Assistant United States Attorney] Muchnick that the guideline provisions there envision something other than a conspiracy situation, where the defendant has been convicted not only of conspiracy but of numerous counts. In all candor, absent the guidelines, I think my sentences in both of these cases would have been very different but I feel bound by the guidelines. So on that basis, I will deny the motion for downward departure.

Sent.Tr. at 10.

Even if we accepted Atkins' argument that the district court believed it had no authority to depart, the conclusion that the district court erred does not follow since Atkins' crime was not a single act of aberrant

---

**2.** When asked by Mr. Muchnick, the Assistant United States Attorney, how many W-2's she filled out for former "employees" of the Fish'N'Such, Atkins stated that she filled out "maybe ten or maybe more" W-2's. Trial Tr. at 574. And this "ten or maybe more" did not include Latasha Nelson, LaRhonda Nelson, or Pernal Mozee. *Id.* at 574–75.

behavior. We have previously defined a single act of aberrant behavior as an act that is "spontaneous and seemingly thoughtless." *United States v. Garlich*, 951 F.2d 161, 164 (8th Cir.1991) (quoting *United States v. Carey*, 895 F.2d 318, 324–25 (7th Cir.1990), and *United States v. Glick*, 946 F.2d 335, 338 (4th Cir.1991)).

In this case, as we have previously stated, the evidence showed that Atkins recruited others to file fraudulent tax returns; Atkins gave instructions on how to file the fraudulent returns; Atkins obtained personal information from the individuals; Atkins prepared fraudulent W–2 forms; and Atkins went with at least two of the individuals when they filed their false returns. In short, the evidence showed that Atkins was an active participant in a conspiracy that spanned a two-month period and that Atkins committed a number of non-spontaneous and pre-planned acts throughout the course of the conspiracy. Given the length of the conspiracy and the large number of pre-planned acts which were committed by Atkins, we conclude that Atkins' crime was not a single act of aberrant behavior. *See Garlich*, 951 F.2d at 164 ("Garlich's actions in planning and executing the financing scheme over a one-year period were not 'spontaneous and seemingly thoughtless.'"); *United States v. Marcello*, 13 F.3d 752, 761 (3rd Cir.1994) (scheme that required the defendant to pre-plan the deposit of $9,000 each day over a one-week period of time was not aberrant behavior).

Accordingly, we conclude that we have no jurisdictional authority to review the district court's refusal to depart downward since the district court's refusal to depart was an exercise of discretion. We further conclude that, even if we were to reach the issue, the district court did not err, as a matter of law, in refusing to depart.

### C. *Batson* Challenge

Atkins, a black female, next argues that the government deliberately struck blacks from the jury pool in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). More specifically, Atkins argues that the Government did not offer a

racially-neutral reason for striking two of the three blacks in the jury pool, namely Juror # 3 and Juror # 4.[3] The Government disagrees, arguing that Juror # 3 was struck because she did not have an attachment to the community—she was the only venireperson who did not own or rent a home in the community—and because she made a "funny face" when asked if filing a false claim against the government should be a crime. As for Juror # 4, the government contends that she was struck because she had a daughter who was a low-level government employee and low-level government employees tend to show hostility towards the government.

We begin our review by noting the proper course of action to be followed after a defendant raises a *Batson* challenge:

A defendant who raises a Batson claim must make a prima facie showing that the prosecutor exercised peremptory challenges on the basis of race. *Hernandez v. New York*, [500] U.S. [352], [358–60], 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991) (plurality). If the defendant makes this showing, the burden shifts to the prosecutor to give a race-neutral explanation for striking the prospective jurors in question. *Id.* A prosecutor's explanation for a strike is considered race neutral if the explanation is facially based on something other than the juror's race, i.e., if discriminatory intent is not inherent in the stated reason. *Id.* After the defendant has a chance to develop a record showing the prosecutor's reason is pretextual, *United States v. Alvarado–Sandoval*, 997 F.2d 491, 491–93 (8th Cir.1993), the district court must decide whether the defendant carried the burden of proving purposeful discrimination, *Hernandez*, [500] U.S. [358–60], 111 S.Ct. at 1866. We review a district court's rulings on *Batson* claims for clear error. *United States v. Day*, 949 F.2d 973, 979 (8th Cir. 1991).

*United States v. Brooks*, 2 F.3d 838, 840 (8th Cir.1993).

In this case, we are satisfied that the district court did not clearly err in allowing the government to strike Juror # 3 and Ju-

---

**3.** Atkins admits that Juror # 8, the only other black in the pool, was properly struck since her

son's name appeared on one of the government's exhibits.

**1406**

ror #4. First, as to Juror #3, we have recognized that the government can strike a venireperson who lacks an attachment or commitment to the community. *See, e.g., United States v. Day*, 949 F.2d 973, 979 (8th Cir.1991) (black female who had a sporadic work history and who did not own property could properly be struck since she did not have an attachment to the community); *United States v. Jackson*, 914 F.2d 1050, 1052–53 (8th Cir.1990) (government can strike those jurors who lack "some experience and commitment to the community."). We have also recognized that "negative body language" can justify a government strike. *See, e.g., Reynolds v. Benefield*, 931 F.2d 506, 512–13 (8th Cir.), *cert. denied*, 501 U.S. 1204, 111 S.Ct. 2795, 115 L.Ed.2d 969 (1991) (so long as the record is fully developed on the point, venireman can be struck if the veniremen grimaces, stares, and/or makes a facial expression which indicates a venireman's hostility towards an attorney or an issue in the case). Thus, we can find no clear error in the district court's decision to allow the government to strike Juror #3.

█ We are likewise convinced that the district court did not err in allowing the government to strike Juror #4. We have consistently allowed the government to use employment status as a valid, race-neutral proxy for juror selection, so long as the government exercises its challenges in a consistent manner. *See, e.g., United States v. Johnson*, 905 F.2d 222 (8th Cir.), *cert. denied*, 498 U.S. 924, 111 S.Ct. 304, 112 L.Ed.2d 257 (1990) (employees of the Division of Family Services could be struck since the employees might be overly sympathetic to the defendant); *United States v. Miller*, 939 F.2d 605, 607–09 (8th Cir.1991) (school teachers could be struck since they tend to be more forgiving and sympathetic). Here, besides striking Juror #4, the government

struck a number of jurors who worked for, or who had friends or relatives who worked for, the local, state or federal government.[4] Thus, given the government's consistent use of government employment as a proxy, we are convinced that the government was not motivated by race when it struck Juror #4. *See Reynolds*, 931 F.2d at 512 (government's peremptory challenges to members of different races with similar characteristics serves to rebut an allegation of a discriminatory purpose). As such, and finding no clear error, we hereby affirm the district court's decision to allow the government to strike Juror #4.

Accordingly, we AFFIRM the conviction and the sentence of Appellant Claudette Atkins.

---

4. Of the nine strikes exercised by the government, eight involved a person who either worked for, or who had a relative or friend who worked for, the government. Besides striking Juror #4, the government also struck Juror #15, a white female who worked for the Department of the Census; Juror #16, a white male who worked for the post office; Juror #22, a white male who was recently retired from the Department of Defense; Juror #25, a white male who used to work for the Department of Defense, the Army,

and the Air Force; Juror #26, a white male who worked for the St. Louis County Department of Health; Juror #28, a white male who had a number of friends who worked for the St. Louis County Police Department; and Juror #30, a white male who spent time in the Army, worked for the Department of Defense, and had a nephew who was an employee of the IRS. The only other struck juror who did not have a connection to the government was Juror #3.