———————

No. 95-1586

———————

United States of America,          *
                                   *
          Appellee,                *   Appeal from the United States
                                   *   District Court for the
     v.                            *   Eastern District of Missouri.
                                   *
Forriss D. Elliott,                *
                                   *
          Appellant.               *

———————

Submitted:  February 14, 1996

Filed:  July 22, 1996

———————

Before BOWMAN, BEAM, and MORRIS SHEPPARD ARNOLD, Circuit Judges.

———————

BOWMAN, Circuit Judge.


     Forriss D. Elliott was convicted of seven counts of mail fraud in violation of 18 U.S.C. § 1341 (1988 & Supp. V 1993) and one count of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (1988) for submitting fraudulent legal bills to the state of Missouri in connection with his work as a special assistant attorney general.  The District Court[1] sentenced him to a term of sixty months of imprisonment.  Elliott appeals his conviction and sentence.  For reversal, Elliott raises four issues.  First, he contends that the mail fraud statute does not apply to purely intrastate mailings.  Second, Elliott, who is black, raises an equal-protection challenge to the racial composition of the all-white jury that convicted him.  Third, he claims that the District Court made a number of evidentiary errors.  Fourth, he challenges

———————————

[1]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

the length of his sentence as calculated under the sentencing guidelines. We affirm Elliott's conviction and sentence.

## I.

In the fall of 1989, Elliott, an attorney in private practice in the St. Louis area, was appointed a part-time special assistant attorney general to represent the Second Injury Fund (the Fund) and the State of Missouri in workers' compensation cases where either the Fund or the state was being sued. In limited circumstances, the Fund provides additional compensation to previously compensated employees who suffer a second job-related injury. The goal of the Fund is to encourage employers to hire the partially disabled by limiting the employer's liability in the event that the employee "receives a subsequent compensable injury resulting in additional permanent partial disability." Mo. Rev. Stat. § 287.220.1 (1994). As a special assistant attorney general, Elliott was authorized to bill the state for legal services rendered and expenses incurred in his work on behalf of the state. Elliott mailed his bills to the state on a monthly basis. The bills he submitted, however, turned out to be grossly inflated.

After the state discovered the fraudulent billing scheme, Elliott was indicted for mail fraud. He was convicted after a third trial by an all-white jury. The first two trials, both of which had black jury members, resulted in hung juries.[2] At trial, the government presented a mountain of documentary evidence that mapped out Elliott's fraudulent billing scheme. Thirty-six billing entries showed that Elliott or one of his employees worked more than twenty-four hours a day, sometimes in excess of fifty hours.

---

[2]After the first two cases ended with hung juries, a third attempt at trial a few weeks later was unsuccessful when a mistrial was declared during the first day of jury selection because reference was made to the fact that Elliott had been tried twice previously.

On forty occasions, Elliott claimed that he or his associate, Steve Lewis, had appeared at a Workers' Compensation Division trial, court hearing, or deposition on behalf of the Fund when, in fact, minute sheets and deposition transcripts revealed that no one from his law firm was present. Elliott also billed the state for settlement negotiations supposedly done on case files that had been closed months or years earlier, some of which Elliott had closed himself. Numerous times the billing entries showed Elliott, who billed himself out at seventy dollars an hour, as the person doing the legal work when, in fact, the work was done by his paralegal or his associate, both of whom had lower billable rates. The documents indicated that, on many occasions, instead of billing the thirty-dollar flat fee that is allowed for handling a partial disability case, Elliott billed partial disability cases at the much more lucrative hourly rate reserved for total disability cases. The documentary evidence also demonstrated that Elliott had grossly exaggerated copying and postage expenses.

Although the substantial documentary evidence was probably enough to convict Elliott, the government also presented witness testimony that showed Elliott was the mastermind of the fraudulent billing scheme. While representing the Fund, Elliott employed two paralegals at different times to assist him in preparing the bills that he sent to the state. Elliott first hired Brenda Leake in August 1990. Leake testified that Elliott ordered her to make bogus entries on his billing statements. She worked for Elliott for about twelve months until she was fired in September 1991. Elliott then hired Connie O'Bryant as a new paralegal to assist in bill preparation. Even though O'Bryant was called as a defense witness, she acknowledged that Elliott gave her false entries to put in the bills. Mary Reinhardt, who worked for the state and received all the bills, also testified. She stated that while Leake was still employed by Elliott, Leake telephoned her to warn her about the false entries and recommended that someone look at the inflated bills. Elliott's former accountant, Brian Cox, also

testified.  In December 1992, after Elliott saw his picture splashed across the front page of the Sunday edition of the St. Louis Post-Dispatch accompanied by a story accusing him of billing fifty-hour work days, Elliott telephoned Cox.  Elliott asked Cox to review his billing statements.  Cox spent two weeks comparing the bills with Elliott's case files.  Cox testified that the bills could not be substantiated.  Finally, the government put on the previous sworn testimony of Elliott himself.  Although denying criminal culpability, Elliott admitted certain bills were "inflated" or false and that the state was billed for work not done.  Trial Trans. (Dec. 1, 1994) at 23-25 (testimony of court reporter regarding Elliott's sworn statements).

## II.

Elliott first argues that the mail fraud statute, 18 U.S.C. § 1341, does not apply to purely intrastate mailings.  Although the evidence shows that Elliott used the United States mails to send his bills to the state, all were sent and received in Missouri.  Relying on United States v. Lopez, 115 S. Ct. 1624 (1995), Elliott insists that mail fraud requires some sort of interstate connection.  We disagree.  Lopez is a Commerce Clause case and therefore has no application whatsoever to the mail fraud statute, which is based on the Postal Power found in Article I, Section 8, Clause 7 of the Constitution.  The Postal Power, of course, gives the federal government the power to deliver mail intrastate.  In Lopez, the Supreme Court struck down the Gun-Free School Zones Act of 1990, which made it a federal offense for any individual knowingly to possess a firearm in a school zone.  Congress had used the Commerce Clause as the source of its authority to enact the Gun-Free School Zones Act.  The Lopez Court determined that Congress exceeded its Commerce Clause authority when it passed the Gun-Free School Zones Act because mere possession of a gun in a school zone did not substantially affect interstate commerce.  Unlike the Gun-Free School Zones Act, the jurisdictional basis of

-4-

the mail fraud statute is grounded in the Postal Power and therefore necessarily encompasses all items passing through the United States mails, even if their passage is purely intrastate. "It is irrelevant that all of the mailings in this case may have been intrastate in nature," United States v. Cady, 567 F.2d 771, 776 n.7 (8th Cir. 1977), cert. denied, 435 U.S. 944 (1978), because "[t]he focus of the statute is upon the misuse of the Postal Service . . . and Congress clearly has the authority to regulate such misuse of the mails," United States v. States, 488 F.2d 761, 767 (8th Cir. 1973), cert. denied, 417 U.S. 909 (1974). See also United States v. Minkin, 504 F.2d 350, 353 (8th Cir. 1974) (affirming mail fraud conviction where fraudulent mailing made only twelve-mile intrastate journey), cert. denied, 420 U.S. 926 (1975); United States v. Mirabile, 503 F.2d 1065, 1067 (8th Cir. 1974) (affirming mail fraud conviction for intrastate mailing), cert. denied, 420 U.S. 973 (1975).

## III.

Elliott next challenges the racial composition of the all-white jury that convicted him as a Fifth Amendment equal-protection violation.[3] He theorizes that the prosecutor, having been stymied by hung racially mixed juries in the first two trials, sought to exclude all potential black jury members from the third trial in the hope of ensuring a conviction. The court seated an all-white jury after the prosecutor eliminated three potential black jurors using challenges for cause and struck another three potential black jurors using peremptory challenges. Elliott argues that the for-cause strikes as well as the peremptory challenges run afoul of

---

[3]The judicially engrafted equal-protection component of the Fifth Amendment is implicated in this case because Elliott is challenging the actions of a federal prosecutor. See United States v. Greene, 995 F.2d 793, 795 (8th Cir. 1993) ("An action that violates the fourteenth amendment guarantee of equal protection when committed by a state actor violates the due process guarantee of the fifth amendment when committed by a federal actor.").

Batson v. Kentucky, in which the Supreme Court held "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."  476 U.S. 79, 89 (1986).[4]

We turn first to Elliott's argument that the prosecutor's use of for-cause strikes against three black venire members was a Batson violation. He insists that with only six peremptory challenges (plus one for alternate jurors), the prosecutor realized that "he would not be able to rid himself of all black jurors, unless he was able to strike some black venirepersons for cause."  Appellant's Brief at 19.  Consequently, Elliott contends that the for-cause strikes in combination with the peremptory strikes resulted in a constitutional violation that deprived him of a fair trial.  We disagree.  Batson applies only to peremptory strikes.  We know of no case that has extrapolated the Batson framework to for-cause strikes.  There is simply no legal basis for this argument, which fails to recognize that peremptory strikes, for which no reasons need be given (absent a Batson challenge), are different from challenges for cause, which by definition require a showing of cause.  A district court is required to strike for cause any juror who is shown to lack impartiality or the appearance of impartiality and, "[a]bsent abuse of discretion, we will not interfere with the District Court's determination of juror qualifications."  United States v. Tibesar, 894 F.2d 317, 319 (8th Cir.), cert. denied, 498 U.S. 825 (1990).  The district court is

_____

[4]There is nothing in the record to indicate which jurors, black or white, were voting against conviction in the first two trials.  Elliott's theory assumes that one or more black jury members voted to acquit.  Such an assumption is unwarranted.  Just as it is wrong for a prosecutor to exclude potential black jurors on the assumption that they will be unable impartially to consider the state's case against a black defendant, so it is equally wrong for Elliott to assume that it was black members of the jury who caused the first two mistrials.

given broad discretion in determining whether to strike jurors for cause because it is in the best position to assess the demeanor and credibility of the prospective jurors.  United States v. Graves, 5 F.3d 1546, 1554 (5th Cir. 1993), cert. denied, 114 S. Ct. 1829 (1994).  After carefully reviewing the record, we are convinced that the District Court did not abuse its discretion when it dismissed three of the prospective black jurors for cause.

We come, then, to Elliott's arguments concerning the peremptory challenges.  The Batson framework, using a three-stage burden-shifting analysis, establishes the order and allocation of proof in challenges to the discriminatory use of peremptory strikes in jury selection.  Purkett v. Elem, 115 S. Ct. 1769, 1770-71 (1995) (per curiam).  In the context of a criminal trial, after the defendant makes a prima facie case of purposeful discrimination in the government's use of a peremptory challenge, the burden shifts to the government to offer a race-neutral explanation for the strike.  Id.  A prosecutor's explanation for a strike is deemed race-neutral if discriminatory intent is not inherent in the stated reason.  Id. at 1771.  The defendant may then attempt to prove that the facially valid reason is a mere pretext and that the real reason for the strike was discrimination.  Id. at 1771.  The defendant retains at all times the ultimate burden of persuasion, id. at 1771, and the trial court's finding on the discrimination issue will be set aside only if clearly erroneous,  United States v. Darden, 70 F.3d 1507, 1531 (8th Cir. 1995), cert. denied, 116 S. Ct. 1449 (1996) and 64 U.S.L.W. 3855 (U.S. June 24, 1996).  On appeal, we are mindful of the fact that "evaluation of the prosecutor's state of mind based on demeanor and credibility lies `peculiarly within a trial judge's province.'"  Hernandez v. New York, 500 U.S. 352, 365 (1991) (plurality opinion) (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)).  After carefully reviewing the trial transcript, we are persuaded that the District Court did not commit clear error in finding that Elliott failed to

prove that the government's race-neutral reasons were mere pretextual covers for unlawful discrimination.

The prosecutor used peremptory challenges to strike three black jurors: Juror No. 4 (Smith), Juror No. 12 (Johnson), and Juror No. 20 (Harper). After Elliott objected to the use of these peremptory challenges as a violation of <u>Batson</u>, the District Court found that Elliott had established a prima facie case of discrimination. This finding required the prosecutor to come forward with race-neutral explanations for the striking of the jurors.

As an initial matter, we conclude that Elliott's <u>Batson</u> challenge with respect to Harper is procedurally barred. At trial, Elliott's counsel initially objected to Harper being stricken as a <u>Batson</u> violation, but then withdrew the objection after the government proffered a race-neutral explanation for the strike. <u>See</u> Trial Trans. (Nov. 28, 1994) at 218-220A. Elliott cannot raise an argument on appeal that he explicitly waived at trial. Accordingly, only the propriety of the strikes against jurors Smith and Johnson are properly before us.

The prosecutor proffered three race-neutral reasons for striking Smith. First, Smith listed "church organization" under the category of "Hobbies and Activities" on the juror survey form. Smith's church activity concerned the prosecutor because Elliott's first trial resulted in a hung jury when one of the jurors had religious convictions that created problems for him in deliberations. Moreover, the prosecutor also observed that Elliott was reading a Bible during voir dire. The only other juror who listed "church" as an activity was a white female, and she also was struck by the prosecution. Second, Smith was struck because she did not own her own home, which the prosecutor believed meant that Smith "had less of a stake in and commitment to the community." Appellee's Brief at 17. The government also struck any other

-8-

prospective panel members who did not own their own homes, which included one white and another black. Third, Smith was laughing with defense counsel during voir dire, and was showing particular interest in his comments, which, as the prosecutor saw it, meant that Smith had developed "more of a bond with defense attorney than the government was comfortable with." Trial Trans. (Nov. 28, 1994) at 214.

Four race-neutral reasons were proffered for striking Johnson. First, Johnson did not own her own home, and as already explained, all potential jurors, white or black, who did not own their own homes were struck. Second, Johnson had relatives employed by the United States Postal Service. Postal employees are often subjected to rigorous scrutiny and secret observation by postal inspectors. Because Elliott was charged with mail fraud, the government's case agent and key witness was a postal inspector. The prosecutor felt that postal employees and their relatives may have negative attitudes toward postal inspectors because of their watchdog role. To avoid this dilemma, all prospective jurors with relatives currently employed by the United States Postal Service were struck, which included a white venireperson who had a relative in the postal service. Third, Johnson failed to respond to certain voir dire questions. When the venirepersons were asked whether they thought the criminal justice system was fair, Johnson failed to raise her hand. When asked whether they thought the criminal justice system was unfair, Johnson again failed to raise her hand. When asked if they had no opinion on the fairness of the criminal justice system, Johnson failed to raise her hand for a third time. The prosecutor struck Johnson for her unresponsiveness. Finally, the prosecutor also felt that Johnson "was looking at him in hostile fashion." Appellee's Brief at 18.

Once the prosecution articulated race-neutral reasons for the peremptory challenges, the burden then shifted to Elliott to offer evidence showing that the reasons given by the government--all

conceded by Elliott to be facially race-neutral[5]--were a mere pretext for discrimination and that the real reason Smith and Johnson were struck was because they were black.  Although Elliott's appellate counsel makes a valiant attempt to show that all of the government's proffered reasons were pretextual, Elliott's trial counsel failed to attack as pretextual several of the race-neutral reasons proffered by the government to justify the strikes.  At trial, Elliott did not challenge as pretextual the striking of Smith because of her church activity; he also did not challenge as pretextual the striking of Johnson because she had relatives in the postal service.  We uphold facially neutral reasons where the opponent of the strike makes no attempt in the trial court to demonstrate pretext. Williams v. Groose, 77 F.3d 259, 261 (8th Cir. 1996); see also United States v. Carr, 67 F.3d 171, 176 (8th Cir. 1995), cert. denied, 116 S. Ct. 1285 (1996).

Although Elliott did attempt to show that the remaining reasons -- lack of community attachment, unresponsiveness during voir dire, and hostility toward one party or undue friendliness with one party -- were a mere pretext for discrimination, he did so only in the most conclusory fashion.  Consequently, the District Court found that Elliott failed to satisfy his ultimate burden of proving purposeful discrimination.  The District Court was in the best position to evaluate the motives of the prosecutor, and the record reveals that the court did so meticulously, painstakingly

---

[5]Our caselaw establishes that explanations of the sort offered by the prosecutor in this case are race-neutral.  See, e.g., Williams v. Groose, 77 F.3d 259, 261 (8th Cir. 1996) (postal workers); United States v. Carr, 67 F.3d 171, 175-76 (8th Cir. 1995) (rented home indicating lack of community attachment), cert. denied, 116 S. Ct. 1285 (1996); United States v. Atkins, 25 F.3d 1401, 1406 (8th Cir.) (insufficient attachment to community), cert. denied, 115 S. Ct. 371 (1994); United States v. Todd, 963 F.2d 207, 211 (8th Cir. 1992) (hostility toward prosecutor); United States v. Day, 949 F.2d 973, 979 (8th Cir. 1991) (sporadic work history and lack of property ownership, indicating lack of community attachment); United States v. Jackson, 914 F.2d 1050, 1052-53 (8th Cir. 1990) (insufficient commitment to community).

noting the several racially neutral reasons offered for the challenges and finding that those reasons were not pretextual. We cannot say that the court clearly erred in making its finding of no discrimination.

In a last-ditch effort to show a <u>Batson</u> violation, Elliott makes a "similarly situated" argument for the first time on appeal. He notes that while Smith was struck because of her church activity, the prosecutor failed to strike several similarly situated white jurors. Specifically, the prosecutor kept a white juror who worked for a Baptist church school and whose husband had been a minister for six years, a white juror who listed "Christian concerts" as a hobby, and a white juror who indicated that he "preach[ed] parttime" as an activity. Similarly, Elliott points out that while Johnson was struck because, among other reasons, she had postal service relatives, the prosecutor did not challenge a white juror who had "a very close friend who is a retired mail man," a white juror whose uncle was a retired letter carrier, and a white juror whose grandmother was a postmaster and whose brother "is a postmaster in a small town."

Elliott is correct that "the government may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics, are also challenged." <u>Reynolds v. Benefield</u>, 931 F.2d 506, 512 (8th Cir.) (civil case), <u>cert. denied</u>, 501 U.S. 1204 (1991). The government must exercise "its challenges in a consistent manner," <u>United States v. Atkins</u>, 25 F.3d 1401, 1406 (8th Cir.), <u>cert. denied</u>, 115 S. Ct. 371 (1994), and treat similarly situated jurors similarly, <u>Davidson v. Harris</u>, 30 F.3d 963, 965 (8th Cir. 1994) (civil case) (noting otherwise neutral explanation for removal of black juror may be pretextual if stated reason also applies to white juror who is not removed), <u>cert. denied</u>, 115 S. Ct. 737 (1995). Elliott thus may have had a factual basis for at least a colorable <u>Batson</u> claim based on the government's failure to strike

-11-

white jurors who arguably were similarly situated to the black jurors who were struck. This argument, however, is untimely since it is made for the first time on appeal. See United States v. Dobynes, 905 F.2d 1192, 1196-97 (8th Cir.), cert. denied, 498 U.S. 877 (1990). Having failed to raise this argument before the trial court, Elliott has waived his right to have it considered by this Court. See Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994).

We hold that the District Court did not err in rejecting Elliott's Batson claims.

**IV.**

Elliott also argues that the District Court made several evidentiary errors when it: (1) limited cross-examination of Brenda Leake, his former paralegal; (2) excluded as irrelevant evidence concerning the routine practices of the Office of the Missouri Attorney General and other special assistant attorneys general; and (3) excluded as irrelevant evidence relating to the routine practices of the Workers' Compensation Division. "We review the evidentiary rulings of a district court only for abuses of discretion, and will reverse only when an improper evidentiary ruling affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." United States v. Ballew, 40 F.3d 936, 941 (8th Cir. 1994) (citations omitted), cert. denied, 115 S. Ct. 1813 (1995).

**A.    Cross-Examination of Brenda Leake**

Elliott maintains that Leake misrepresented her educational and employment history on her resume, which he relied on when he hired her as a paralegal. He claims that these misrepresentations were relevant to his defense because Leake's "lack of education and experience caused mistakes and erroneous billings." Appellant's

Brief at 43. According to Elliott, the jury was entitled to know about Leake's supposed lies because it was these lies that "lulled" Elliott "into believing that she was capable of relieving him of much of the work generated by the thousands of files." Id. Armed with this information, Elliott contends that the jury would have believed his cries of innocence and chalked up the over-billings to Leake's mistakes.

Elliott sought to introduce several documentary exhibits, including Leake's resume, to show that Leake misrepresented her educational and work experience. He wanted to use these exhibits to impeach Leake on cross-examination. Trial Trans. (Nov. 30, 1994) at 22. Elliott was not allowed to use the documentary exhibits, however, because the trial court granted the government's motion in limine to exclude the exhibits as extrinsic evidence of Leake's conduct. Federal Rule of Evidence 608(b) prohibits the use of extrinsic evidence to prove specific instances of a witness's conduct. United States v. Johnson, 968 F.2d 765, 766 (8th Cir.), cert. denied, 506 U.S. 980 (1992). Consequently, "[w]hile documents may be admissible on cross-examination to prove a material fact, or bias, they are not admissible under Rule 608(b) merely to show a witness' general character for truthfulness or untruthfulness." United States v. Martz, 964 F.2d 787, 789 (8th Cir.) (citations omitted), cert. denied, 506 U.S. 1038 (1992). The reason for barring extrinsic evidence "is to avoid holding mini-trials on peripherally related or irrelevant matters." Id. "To the extent that such evidence is ever admissible, the introduction of extrinsic evidence to attack credibility is subject to the discretion of the trial court." Johnson, 968 F.2d at 766. Given Rule 608(b)'s admonition against the introduction of such evidence, we conclude that the District Court did not abuse its discretion when it excluded the exhibits as extrinsic evidence.

We note that Elliott fails to mention Rule 608(b) in his opening brief, relying instead on the general principle that

-13-

criminal defendants are entitled to a "searching cross-examination." Appellant's Brief at 41. That is exactly what Elliott got. Although the trial court excluded the extrinsic evidence, it did not place any specific limitations on areas of cross-examination. Elliott was given a wide berth to engage in a searching and wide-ranging cross-examination as long as it did not require the use of extrinsic evidence. Elliott was thus required to "take his answer" because Rule 608(b) precludes him from using extrinsic evidence to impeach the witness. United States v. Capozzi, 883 F.2d 608, 615 (8th Cir. 1989) (citations to quoted cases omitted), cert. denied, 495 U.S. 918 (1990).

Despite the District Court's generous latitude with respect to cross-examination questions, Elliott contends that the government's motion in limine sought "to bar defendant from using documents and cross-examining [Leake] as to misrepresentations concerning her educational background and her job history." Appellant's Brief at 38 (emphasis added). Elliott is mistaken. The court specifically informed defense counsel that he could ask Leake questions about her education and work experience. Trial Trans. (Nov. 30, 1994) at 20-21. The court simply requested that, prior to those questions being asked, defense counsel approach the bench and proffer the question to allow the court to make a ruling. Id. (Nov. 29, 1994) at 15-16; id. (Nov. 30, 1994) at 9-10, 22-23. There were no questions proffered by the defense that the court did not allow, and Elliott was free to ask Leake anything he wished concerning misrepresentations by her as to her education and employment. We are unable to see any abuse of discretion in the District Court's handling of this matter.

## B.    Routine Practices of the Attorney General's Office and Other Special Assistant Attorneys General

Elliott sought to introduce evidence relating to the routine practices of the Office of the Missouri Attorney General and other

special assistants because he "wanted to show that mistakes were common in the manner in which [the bills] were handled by the Attorney General's Office and in the manner in which files were routinely reviewed on a monthly basis by Special Assistants." Appellant's Brief at 45 (citations omitted). The routine practices ostensibly would have been established by the proffered testimony of two other special assistant attorneys general. The special assistants would have testified that (1) special assistants were told to use their own best judgment when determining whether to categorize a file as a partial or total disability case, and (2) they had received closed files without being told that the files were closed and were paid for work done on the closed files. The District Court excluded this evidence as irrelevant. See Fed. R. Evid. 402 (stating irrelevant evidence is inadmissible). After carefully reviewing the record, we conclude that the District Court properly excluded this evidence as irrelevant.

The issue at trial was whether Elliott intentionally defrauded the state by knowingly submitting false bills. The proffered testimony concerning the categorization of files or the fact that other special assistants were paid for work done on closed files had nothing to do with this issue. On cross-examination, one of the proffered witnesses admitted that he had no personal knowledge of how Elliott prepared his legal bills, kept his time, dealt with the courts, or reviewed his files. The proffered witness could only testify as to how he prepared his own legal bills and handled cases in which he was involved. Put simply, the proffered testimony had nothing to do with Elliott and was irrelevant to the question of his guilt or innocence. The District Court did not abuse its discretion in excluding this evidence.[6]

_____

[6]Because the evidence was irrelevant to any issue in the case, we need not and do not discuss Elliott's arguments based on Federal Rule of Evidence 406 (evidence of habit or routine practice). These arguments are meritless in any event.

-15-

## C.    Routine Practice of the Workers' Compensation Division

Elliott also sought to introduce testimony concerning routine practice at the Workers' Compensation Division.  The purpose of the proffered testimony was to show that court proceedings at the Compensation Division were rather informal and that the absence of a name on a minute sheet did not necessarily mean that the special assistant was absent from the proceeding.  Although the District Court excluded this evidence as being irrelevant, the evidence may have had some relevance because the government's case included proof that Elliott billed the state for court appearances at the Compensation Division despite the fact that minute sheets failed to name him as being present.  Elliott argues that the evidence was admissible for a purpose envisioned by Federal Rule of Evidence 406--i.e., to show that the Compensation Division was acting in accordance with its usual laxness when it failed to register on the minute sheets all attorneys in attendance for the proceedings.  We are not convinced that the proffered testimony established that the allegedly slack practices at the Compensation Division were sufficiently numerous or regular to rise to the level of cognizance under Rule 406 as a routine practice.  But even assuming that the laxness did constitute a routine practice, if the District Court abused its discretion in excluding this testimony the error amounted to, at most, only harmless error given the weight of the government's massive case against Elliott.  See United States v. Mihm, 13 F.3d 1200, 1205 (8th Cir. 1994); United States v. DeAngelo, 13 F.3d 1228, 1233 (8th Cir.), cert. denied, 114 S. Ct. 2717 (1994).

## V.

Elliott challenges the length of his sentence as calculated under the sentencing guidelines.  Mail fraud carries a base-offense level of 6, U.S.S.G. § 2F1.1(a) (1995), which, with Elliott's criminal history category of I, would provide a sentencing range of

imprisonment of zero to six months. Through a series of enhancements recommended by the presentence report (PSR), the base-offense level was raised to 24. The enhancements Elliott received were: (1) an eight-level increase pursuant to id. § 2F1.1(b)(1)(I) because the "amount of loss" to the state exceeded $200,000; (2) a two-level increase pursuant to id. § 3C1.1 because Elliott obstructed the administration of justice by asking his paralegal to lie and by lying on the witness stand himself; (3) a two-level increase pursuant to id. 2F1.1(b)(2)(A) for "more than minimal planning"; (4) a four-level increase pursuant to id. § 3B1.1(a) for his extensive "role in the offense"; and (5) a two-level increase pursuant to id. § 3B1.3 for his abuse of a position of public trust in his capacity as a special assistant attorney general. As a result of these enhancements, Elliott received a sentence of sixty months of imprisonment. Elliott claims the District Court erred in accepting the enhancements contained in the PSR because the court failed to make "a finding as to the allegations in the PSR which were disputed by appellant." Appellant's Brief at 51. "We review the factual findings a district court makes in sentencing for clear error, and the application of the guidelines to the facts de novo." Darden, 70 F.3d at 1544. We conclude that the District Court did not commit any error in making its sentencing determination.

Where the defendant objects to statements in the PSR, a district court should neither merely accept the PSR nor require the defendant to disprove the disputed facts. United States v. Wise, 976 F.2d 393, 404 (8th Cir. 1992) (en banc), cert. denied, 507 U.S. 989 (1993). Instead, the government bears the burden of proving any disputed enhancement factors. United States v. Hammer, 3 F.3d 266, 272 (8th Cir. 1993), cert. denied, 114 S. Ct. 1121 (1994). Elliott complains that the government did not satisfy its burden with respect to the enhancements because the trial court did not hold an evidentiary hearing before sentencing. "A formal sentencing hearing is not, however, the exclusive means by which the government may meet [its evidentiary burden]." United States

v. Bellrichard, 62 F.3d 1046, 1051 (8th Cir. 1995) (quoting United States v. Fetlow, 21 F.3d 243, 250 (8th Cir.), cert. denied, 115 S. Ct. 456 (1994)) (alteration in Bellrichard), cert. denied, 116 S. Ct. 1425 (1996). In fact, a district court may base its findings on evidence presented at trial "even though no additional exhibits or testimony are introduced at the sentencing phase." Id. (quoting Fetlow). That is what the District Court did in this case. For each of the enhancements that Elliott challenges on appeal, the District Court properly based its findings on evidence adduced at trial. See Trial Trans. (Mar. 3, 1995) at 11 (amount of loss); id. at 18 (obstruction of justice)[7]; id. at 21 (more than minimal planning); id. at 26 (role in the offense); id. at 28-29 (abuse of position of trust). The District Court methodically considered the required grounds for each enhancement and carefully based its factual findings on the evidence. We cannot say that any of these factual findings are clearly erroneous.

Finally, Elliott claims that he was entitled to a downward departure because other defendants snared in the Second Injury Fund investigation received far lesser sentences. Elliott sought access to the sealed PSRs of these other defendants to bolster his

---

[7]As noted above, the government provided the sentencing court with two independent grounds to support the obstruction of justice enhancement. First, the government claimed that Elliott asked his paralegal to lie. During the first trial, Brian Cox testified that Connie O'Bryant, the paralegal, told him in Elliott's presence that Elliott directed her to lie. Second, the government argued that Elliott himself lied on the witness stand. The District Court accepted both of these grounds as a basis for the enhancement. On appeal, Elliott complains that the District Court improperly used Cox's testimony from the first trial--which resulted in a hung jury--to enhance his sentence. He argues that it is "wrong to rely on testimony in an earlier trial in which the issue was certainly disputed and the jury did not convict appellant." Reply Brief at 6. We need not and do not decide whether it was improper for the sentencing court to rely on Cox's earlier testimony from the first trial because the court's finding that Elliott himself lied on the witness stand provides an independent and sufficient basis for enhancement.

argument for a downward departure, but his request was denied by the District Court. "A district court's failure to grant a defendant a downward departure is not reviewable on appeal if the court was aware of its authority to grant a departure." Darden, 70 F.3d at 1549. Elliott claims that "there is nothing in the record to reflect the Court's awareness of the authority to depart, because the District Court said nothing at all with reference to a departure or authority to depart." Reply Brief at 6. Elliott is simply wrong. The record reveals that the court was in fact well aware of its authority to grant a departure and opted not to do so. On at least two occasions during the sentencing hearing, Elliott's counsel pressed the court to consider the lighter sentences of the other Second Injury Fund defendants and to use that as a basis for departing downward in this case. Trial Trans. (Mar. 3, 1995) 4-7; id. at 41-42. Aware of its discretionary authority to depart downward, the court exercised its discretion by declining to grant the requested departure. Its decision is not reviewable.

## VI.

For the foregoing reasons, the judgment of the of the District Court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-19-