UNITED STATES of America,
Plaintiff-Appellee,

v.

Thomas P. DEMPSEY,
Defendant-Appellant.

No. 86–1308.

United States Court of Appeals,
Tenth Circuit.

Sept. 28, 1987.

Richard D. Irvin, Boulder, Colo., for defendant-appellant.

William G. Pharo, Asst. U.S. Atty. (Robert N. Miller, U.S. Atty., with him on the brief), Denver, Colo., for plaintiff-appellee.

Before LOGAN, McWILLIAMS and ANDERSON, Circuit Judges.

LOGAN, Circuit Judge.

■ This appeal requires us to consider whether and under what circumstances a particular deaf member of our society may serve on a federal jury. Defendant, Thomas P. Dempsey, was convicted of the theft of color television sets from an interstate shipment, in violation of 18 U.S.C. § 659, and conspiracy to commit this theft, in violation of 18 U.S.C. § 371. On appeal defendant argues that the trial court erred in (1) denying defendant's challenge for cause against a deaf juror and (2) allowing an interpreter to be present during jury deliberations.[1]

On November 7, 1985, an FBI informant made a pre-arranged purchase of a stolen Sharp television set. Alan Pennington used his pickup truck to deliver the stolen set to the informant. After this delivery FBI agents followed Pennington to a residence at 605 Ammons Street. On

---

1. Defendant also argues that the court erred in admitting evidence seized from his person incident to his arrest. We hold, however, that there was probable cause for the arrest and, therefore, the admission of the related evidence was not error.

At the outset of this case, Wendy Hoffman, a computer operator for the Internal Revenue Service, was called as a prospective juror. Hoffman is deaf,[2] and, although she is able to read lips, she required an interpreter to translate spoken English into sign language.[3] The court appointed Bertha Kondrodis, a professional interpreter proficient in sign language, to interpret for Hoffman. Kondrodis had past experience interpreting for deaf defendants and was sworn to interpret accurately.[4]

At the conclusion of Hoffman's questioning, defendant's counsel challenged Hoffman for cause, arguing "that she has an interpreter. They're going to have a person in the jury room, you know, who is not a jury member. It's got to happen, and that would violate the sanctity of the jury." II R. 173. The prosecution also expressed concern about having a "13th party who is not a juror in the jury room. And I'm not sure what effect that has on any appeal." II R. 173–74. The trial court denied the challenge:

"Let me just say to you that I feel very strongly about this that handicapped people should be able to partake fully in the jury process; and if that's going to go up on appeal, then it will, but I'm not going to excuse her. Just as I would let someone who is blind go in with a seeing-eye dog."

II R. 174. After exhausting his peremptory challenges, defendant renewed his motion challenging Hoffman for cause. The prosecutor in a sense joined the motion, asking that defendant be given one more peremptory challenge. The court denied both motions. Defendant subsequently moved for a mistrial and renewed that motion immediately before the beginning of jury deliberations. The court denied the motion for mistrial on both occasions.

Kondrodis interpreted for Hoffman during the voir dire, the trial, and the jury deliberations. Despite her deafness, Hoffman is not mute and was able to speak for herself during both the voir dire and the jury's deliberations.[5] Thus, Kondrodis was needed only to interpret into sign; she was not needed to interpret from sign into spoken English.

---

November 14 the person who had sold the earlier set advised the informant that Pennington would deliver ten more sets at approximately 5:30 p.m. that day. At 4:30 p.m. FBI agents observed Pennington drive his empty pickup into the garage at 605 Ammons Street. At approximately 5:55 p.m. the FBI agents observed Pennington and defendant exiting the garage in Pennington's pickup; they saw that the bed of the pickup appeared to be loaded with boxes which were partially covered with a tarpaulin. The agents stopped directly behind the pickup at a stop light and observed defendant looking back at them. Pennington then increased the speed of the truck and cut across two lanes of traffic to get to a highway exit. At 6:05 p.m. the FBI agents stopped the truck. An agent saw the word "Sharp" printed across a box which was not completely covered by the tarpaulin. These facts provided sufficient probable cause to conclude that defendant was involved in the theft of the televisions. His search incident to arrest was therefore permissible.

2. There appears to be no single generally-accepted legal definition of deafness. *See* Note, *Due Process: The Deaf and the Blind as Jurors,* New Eng.L.Rev. 119, 119 n. 1 (1981). While the record does not reflect the exact degree of Hoffman's hearing impairment, it seems clear that Hoffman was profoundly, if not completely, deaf.

3. At voir dire the trial judge questioned Hoffman with the help of an interpreter about her need for an interpreter:

"Q. Ms. Hoffman, are you able to read lips?
A. Yeah.
Q. So you can see what I am saying and not necessarily look at your interpreter?
A. Well, most of the time. I have to keep looking at the interpreter. But if it's just a regular one person to person, there is no problem."

II R. 165–66.

4. The trial court delivered the following oath:

"Let me ask you to raise your right hand. And do you solemnly declare and affirm that you will and truly—well and truly will render and interpret into sign language any questions asked by the Court or by the attorneys and any comments by anyone who is speaking and that you will do this under the pains of or penalties of perjury?"
THE INTERPRETER: I will."

II R. 200.

5. The record does not disclose whether Hoffman was deaf from birth or how she acquired the ability to speak.

After the first day of trial, the court moved Hoffman in the jury box and repositioned the interpreter, Kondrodis, "because I want her to be able to see the witness and also see the interpreter; and it appears to me that this seat that she's in is not the best seat for a line of vision" to see both the interpreter and the witnesses. III R. 318. Before jury deliberations began, the judge in open court instructed Kondrodis:

"I do have one more statement to make to all of you and especially to our able interpreter, Ms. Kondrodis.

Ms. Kondrodis, your function in the jury room is only to interpret. You are instructed not in any way to express any ideas that you may have, any opinions you may have, or any observations. You are strictly an interpreter. Do you understand that?

INTERPRETER KONDRODIS: Yes, I understand that."

Supp. II R. 2.

Hoffman was chosen by the jury to be its foreperson. As foreperson, Hoffman sent a note with a question to the judge and delivered the verdict form to the court. After the guilty verdict had been announced and the jury was polled, the court questioned Kondrodis to ensure that she had not participated in the deliberations.[6]

Defendant does not contest the qualifications or ability of Kondrodis as an interpreter. Neither during nor after the court's inquiry into Kondrodis' conduct did defendant or the government ask to examine Kondrodis or to question the jurors pursuant to Fed.R.Evid. 606(b). There is no assertion or evidence in the record of any conduct on Kondrodis' part contrary to the court's oath and instructions.

## I

Defendant asserts that Hoffman's deafness made her unqualified under federal statutes governing jury service. Under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861–1877, any person is qualified to serve on grand and petit juries in the district court unless, *inter alia*, that person "(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form; (3) is unable to speak the English language; [or] (4) is incapable, by reason of mental or physical infirmity, to render satisfactory jury service." *Id.* § 1865(b)(2)–(4).

■ Hoffman competently completed her juror qualification form, and it is clear from her educational and work experience that she could read, write, and understand the English language with proficiency. Thus, there is no basis for concluding that she was unqualified under subsection (2). Defendant has conceded that Hoffman "had little problem in speaking English," Appellant's Opening Brief at 14, thus placing her outside the literal meaning of subsection (3). And while the phrase "speak the English language" is often used to mean "speak *and understand* spoken English," this is not a necessary construction. We decline to narrow the literal meaning of the statute to create a per se rule, under subsection (3), against the qualification of deaf jurors.

Subsection (4) does not precisely define what qualifies as "satisfactory" jury service. "Satisfactory jury service" must at least meet the constitutional requirements of a fair trial. *See In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."). We believe that performance meeting the constitutional requirement should satisfy the statutory requirement under subsection (4). *See* Note, *Jury Selection: The Courts, The Constitution, and the Deaf,* 11 Pac. L.J. 967, 975 (1980). Because determinations of qualifications are committed to the sound

---

6. The trial judge stated:
   "And I have one more question of our interpreter in this case, Ms. Kondrodis. Could you tell me whether you took any part in the deliberations other than just to translate to the sign language?

THE INTERPRETER: No, I was not involved in any of the discussion."
IV R. 539.

discretion of the trial court, we will not reverse such determinations unless the court has clearly abused its discretion. *See United States v. Mason*, 440 F.2d 1293, 1298 (10th Cir.), *cert. denied*, 404 U.S. 883, 92 S.Ct. 219, 30 L.Ed.2d 165 (1971). Thus, we will find an abuse of discretion under subsection (4) only if a juror does not meet the constitutional requirements. We therefore consider now the constitutional challenges to Hoffman's competency for jury service.

Defendant first contends that Hoffman's deafness rendered her incapable of evaluating the evidence. We hold, however, that the use of an interpreter at trial was an acceptable means to accommodate Hoffman's hearing loss. The propriety of using interpreters for both deaf defendants and deaf witnesses is well settled. The Advisory Committee Notes of both Fed.R.Crim.P. 28 and Fed.R.Civ.P. 43(f) explicitly contemplate the use of interpreters for the deaf at trial. *See also* Fed.R.Evid. 604 (implementing Fed.R.Crim.P. 28 and Fed.R.Civ.P. 43(f)). The Court Interpreters Act, 28 U.S.C. § 1827, specifically provides for the certification and appointment of an interpreter if a "party (including a defendant in a criminal case), or a witness who may present testimony ... suffers from a hearing impairment (whether or not suffering also from a speech impairment)." *Id.* § 1827(d)(2). More generally, the practice of translating non-English-speaking witnesses' testimony has been upheld. *See, e.g., United States v. Miller*, 806 F.2d 223, 224 & n. 1 (10th Cir.1986) (noting statute approves appointment of interpreters, and approving appointment of standby interpreter); 28 U.S.C. § 1827(d)(1). Any problems with inadequate interpretation, be-

cause the interpreter either interjects opinions or incompetently interprets can be monitored by the parties to the suit because the proceeding is in open court.[7] Further, the problem of incompetent or slanted interpretation would be minimized in the instant case because Hoffman could read lips and hence could check for herself the accuracy of much of the interpreter's translation.

■■■ Defendant contends also that, even if the interpretation is adequate, Hoffman could not accurately evaluate the demeanor of witnesses. The trial judge sought to minimize this effect early in the trial by moving the interpreter nearer to the witness stand so Hoffman could see both at once.[8] That Hoffman could not continuously evaluate the witnesses' demeanor does not mean that her ability to serve was impermissibly impaired. For example, the trial judge allowed jurors to take notes, an option which may have diverted them at times from testimony. Hoffman's inability to hear no doubt reduced one dimension of her ability to judge demeanor. But her other senses were fully operative. Many jurors have somewhat less than perfect hearing or vision, or have other limitations on their abilities to assimilate or evaluate testimony and evidence. A defendant is not entitled to a perfect trial, but only a fair one. We cannot find, without more, that Hoffman's overall ability to perceive and evaluate evidence was so impaired as to render the trial constitutionally unfair to defendant.

In sum, Hoffman's ability to perceive and weigh the evidence is best evaluated by the trial judge. Hoffman was both li-

---

7. If the interpreter's adequacy comes into question, the parties can have another interpreter present to review the quality of the translation. And a court might possibly create a record by videotaping the proceedings. As discussed *infra*, the possibility of such monitoring at trial stands in contrast to monitoring jury deliberations.

8. It might be argued that placing the interpreter next to the witness will distract hearing members of the jury. We do not believe the speculative possibility of distraction requires reversal. Note, *Due Process: The Deaf and the Blind as*

*Jurors,* 17 New Eng.L.Rev. 119, 138 n. 108 (1981) ("only minimal distraction occurs when an interpreter is used in a classroom and that distraction dissipates quickly as the novelty wears off") (quoting Note, *Procedural Due Process: A Deaf Defendant's Right to be Heard Should Encompass a Right to "Hear" Civil Trials Through Interpretation*, 29 Cath.U.L.Rev. 867, 887 (1980)). If the presence of an interpreter automatically required reversal, a court could not convict a deaf or non-English-speaking person of a crime.

terate and articulate; her ability to speak and read lips mitigated the effects of her hearing loss. She was an active and willing participant in the trial process, elected by the other jurors to serve as foreperson. We hold that the trial judge did not abuse her discretion in allowing Hoffman, with the aid of an interpreter, to consider evidence presented at trial.

## II

Defendant has also challenged the interpreter's presence during jury deliberations, an issue he raised in his challenge of juror Hoffman for cause. Defendant contends that the presence of a thirteenth person in the jury room who is not a member of the jury deprives him of his right to a fair and impartial trial by jury under the Sixth and Fourteenth Amendments. If we rule that an interpreter may not be present during jury deliberations, of course we must hold that the trial court erred in denying defendant's challenge for cause.

The interpreter's presence during jury deliberations raises problems distinct from those relating to whether a deaf person can fulfill the juror's functions of understanding the evidence and fairly evaluating defendant's guilt on the charged offenses. Three concerns have been raised in this area: (1) whether the presence of an interpreter would increase the likelihood of post-trial revelations of the jury deliberations or enhance challenges to the verdict; (2) whether the interpreter's presence would inhibit the jury's deliberations; and (3) whether the interpreter might unlawfully participate in the jury deliberations.

## A

We first consider whether the presence of an interpreter poses a threat to the secrecy of jury deliberations. In *United States v. Virginia Erection Corporation*, 335 F.2d 868 (4th Cir.1964), the court condemned the presence of an alternate juror because of the possibility that the alternate might discuss the deliberations after the trial ended. The court concluded:

"[T]he presence of the alternate in the jury room violated the cardinal principle that the deliberations of the jury shall remain private and secret in every case. The presence of any person other than the jurors to whom the case has been submitted for decision impinges upon that privacy and secrecy."

*Id.* at 872 (footnote omitted); *see also* Fed. R.Crim.P. 23(b) advisory committee's notes on 1983 amendment (quoting *Virginia Erection* in support of excluding nonparticipating alternate jurors from deliberations). This circuit has also stressed the importance of secrecy. *See United States v. Beasley*, 464 F.2d 468, 470 (10th Cir.1972) (citing *Virginia Erection*); *United States v. Baccari*, 489 F.2d 274, 275 (10th Cir. 1973) (affirming recall of alternate juror by distinguishing *Virginia Erection*), *cert. denied*, 417 U.S. 914, 94 S.Ct. 2614, 41 L.Ed.2d 218 (1974); *cf. Eckstein v. Kirby*, 452 F.Supp. 1235, 1244 (E.D.Ark.1978) ("the presence of a thirteenth person during jury deliberations ... violates the secrecy of the jury room and thereby deprives an accused person of their [sic] right to trial by jury under the Sixth and Fourteenth Amendments").

One byproduct of the unanimity requirement in criminal jury trials is that jurors bear joint and equal responsibility for the verdict. Thus they are likely to feel a proprietary interest in the verdict and the discussion from which it emerged. This interest may inhibit juror's post-trial disclosures of matters concerning their deliberations, more so than would be the case of an observer who did not participate. But while this proprietary interest may encourage such secrecy, the law does not require it. There is no strict secrecy rule; jurors are not prohibited by law from discussing their deliberations after the case is over. Absent good cause for restraint, jurors are free to discuss their service as they choose. *In re Express News Corp.*, 695 F.2d 807, 810 (5th Cir.1982). Indeed, in some places lawyers routinely inquire and jurors sometimes make public statements about what convinced them. And while we have approved protecting jurors from post-trial harassment, *see United States v. Hall*, 424 F.Supp. 508, 538–39 (W.D.Okla.1975), *aff'd*,

536 F.2d 313 (10th Cir.1976), *cert. denied,* 429 U.S. 919, 97 S.Ct. 313, 50 L.Ed.2d 285 (1976), we have also prohibited blanket orders denying jurors the right to post-trial discussion of the case. *Journal Publishing Co. v. Mechem,* 801 F.2d 1233, 1236–37 (10th Cir.1986).

The most important protection of the secrecy of jury deliberations is in the Federal Rules of Evidence, which prohibit a juror from testifying

> "as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."

Fed.R.Evid. 606(b). We have no doubt that this rule would prohibit the post-trial testimony of an interpreter serving as a deaf juror's ears in the deliberations. We note that the rule expressly prohibits "evidence of any statement by a juror concerning a matter about which the juror would be precluded from testifying." *Id.* Surely this would forbid an interpreter from testifying as to what was said in the jury room.

Indeed, we believe an interpreter may be even less likely than a juror to reveal the confidences of the jury room. The trial court can and should administer an oath requiring that the interpreter will neither interfere with the deliberations nor reveal the confidences of the jury. Temporary Regulations of the United States Courts Administrative Office made pursuant to the Court Interpreters Act, 28 U.S.C. § 1827, suggest such an interpreter's oath: "I ... will guard any confidential information entrusted to me. I will not discuss the testimony or the merits of the case under any circumstances, with anyone, particularly not with those for whom I interpret."

In the instant case, the trial judge made no attempt to protect the secrecy of the jury deliberations by ordering the interpreter not to discuss the case after trial; but the judge also expressly released the jury members from their obligation not to discuss the case. There is no evidence that interpreter Kondrodis did discuss the secret deliberations of the jury or thought she had a right to do so. We see no basis in the secrecy argument for prohibiting an interpreter for a deaf juror.

**B**

■ The critical question, we believe, is whether the presence of a thirteenth person in the jury room may have a "chilling" effect on the jury's deliberations—that is, whether it will inhibit the frankness of the discussion and deprive the eventual verdict of legitimacy. The court in *Virginia Erection* gave this as a further reason for forbidding the presence of an alternate juror during deliberations. "It is possible that [the alternate's] presence may have operated to some extent as a restraint upon the jurors and their freedom of action and expression." 335 F.2d at 872. In addition, several old state cases cite this chilling effect as the principal basis for a flat rule granting a new trial whenever it is shown that an outsider was present at any time during jury deliberations. *See People v. Knapp,* 42 Mich. 267, 3 N.W. 927 (1879) (presence of outsider might restrain jurors and thereby influence result); *Gandy v. State,* 24 Neb. 716, 40 N.W. 302 (1888) (following *Knapp* ); *People v. Chambers,* 279 Mich. 73, 271 N.W. 556 (1937) (noting chilling effect). *But see Crockett v. State,* 52 Wis. 211, 8 N.W. 603 (1881) (rejects *Knapp* ; mere presence of bailiff in jury room would not tend to embarrass deliberations); *State v. Flint,* 60 Vt. 304, 14 A. 178 (1888) (same); *Graves v. Territory,* 16 Okla. 538, 86 P. 521 (1908) (same). As one law review noted, however, the cases nearly all involve the presence of a judge, bailiff, or lawyer whose mere presence as persons learned in the law or connected with the court system might well affect deliberations. *See Jury Selection: The Courts, The Constitution, and the Deaf,* 11 Pac.L.

Rev. at 979. An alternate juror who heard the evidence with the understanding that he or she might have to help decide the case is essentially in the same status. *See Beasley,* 464 F.2d at 469. Indeed, the alternate juror who has heard the evidence, has anticipated participation in the deliberations, and has no other role in the jury room may not be able to resist participating in some manner, by words or expression.

The key question, we believe, is whether an interpreter for a deaf juror would be perceived by the other jurors, absent any evidence of inappropriate behavior, as an independent substantiality who might inhibit discussion. While we could speculate that it might, we do not believe that it would. First, we think this television-age society has become so accustomed to seeing interpreters for the deaf translating to sign political speeches, newscasts, and the like that virtually all of us have come to view such interpreters more as part of the background than as independent participants. Second, an important social policy argues against automatically foreclosing members of an important segment of our society from jury duty simply because they must take an interpreter into the jury room. Several states have supported this policy by specific legislation permitting deaf jurors to serve.[9] A decision by this court that they must be excluded because of the interpreter's presence in the jury room, if deemed persuasive by other courts, would doom that legislation on the shoals of the federal constitution. The issue before us is not whether a statute might constitutionally exclude the deaf as jurors, as was upheld in *Eckstein v. Kirby,* 452 F.Supp. 1235 (E.D.Ark.1978), but whether it *must* exclude them. We do not believe the mere presence of interpreter Kondrodis had an inhibiting influence on this jury, and we therefore will not adopt a per se rule that an interpreter's presence in the jury room requires a new trial.

### C

That leaves one further line of inquiry. Kondrodis was in the jury room. How do we know that she did not participate in the deliberations by facial expressions, pauses, gestures or otherwise, influencing juror Hoffman and perhaps the others? And how do we know that she correctly interpreted or did not influence Hoffman's vote by selectively reporting conversation when two jurors were talking at once?

We cannot know for sure. But we do know that she swore an oath to interpret correctly under penalties of perjury and that the trial judge admonished her that she was not "in any way to express any ideas ... opinions ... or observations. You are strictly an interpreter." Supp. II R. 2. We know she told the court after jury deliberations that she took no part in the deliberations other than to translate. We know also that if she acted properly as an interpreter, she was translating to sign at all times that any juror other than Hoffman was speaking. Thus she was no quiet observer free to grimace, nod, or shake her head in agreement or disagreement with the discussion. Finally, no allegation of any impropriety by the interpreter while in the jury room has been made either by Hoffman, who could read lips and who spoke for herself, or by any other juror.

Were we to set aside defendant's conviction and require a new trial in this case because of the interpreter's undue influence, it would not be based upon any fact. Instead, it would rest upon speculation no different than that we have rejected in holding that mere presence of the inter-

**9.** We note that several states have recently enacted legislation which provides for the use of interpreters for deaf jurors during jury deliberations. *See, e.g.,* La.Code Crim.Proc.Ann. art. 401.1(B) (West 1987) ("The verdict of the jury shall be valid notwithstanding the presence of the interpreter during deliberations."); Conn. Gen.Stat.Ann. § 51–245(d) (1985) ("[I]f any juror is deaf or hearing impaired, such juror shall have the assistance of a qualified interpreter who shall be present throughout the proceeding and when the jury assembles for deliberation."); Ill.Rev.Stat. ch. 110, § 8–1402 (1987 Supp.) ("In the case of a deaf juror, the interpreter shall be available throughout the actual trial and may accompany and communicate with such juror throughout any period during which the jury is sequestered or engaged in its deliberations.").

preter is not enough to require reversal. This we decline to do.

 A different situation would arise if there were evidence that the interpreter behaved improperly. Here the issue would be whether Fed.R.Evid. 606(b), which strictly limits judicial inquiry about what went on in the jury room, would allow evidence of such misbehavior. That rule would permit a juror to testify "on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror." *Id.* Although the Supreme Court recently prohibited jurors' evidence that other jurors were drinking and smoking marijuana during deliberations, *Tanner v. Conover*, —— U.S. ——, 107 S.Ct. 2739, 97 L.Ed.2d 90 (1987), it rejected a distinction based upon whether an event constituting an outside influence occurred within or without the jury room. *Id.* at ——, 107 S.Ct. at 2746. We believe that any participation, beyond translation, by the interpreter would be an improper external influence on the jury. Thus, the rule 606(b) exception is sufficient to satisfy defendant's legitimate concerns about improper behavior by the interpreter that might have affected the verdict. In addition, showing the impropriety itself would be sufficient for a new trial without demonstrating that it in fact affected the vote and thus prejudiced the defendant:

> "The inquiry at a hearing under a standard which requires a showing of prejudice is itself a dangerous intrusion into the proceedings of the jury. The jury when organized is acting as a separate entity. The purpose sought to be achieved at such a hearing is not of sufficient importance to warrant such an inquiry in comparison to the possible harm or appearance of interference."

*Beasley*, 464 F.2d at 470.

Thus, any evidence from jurors that the interpreter acted other than strictly as an interpreter would warrant a new trial regardless of whether it actually affected their votes. The judge, before the verdict is announced, should inquire, as did this judge, whether the interpreter abided by her oath to act strictly as an interpreter and not to participate in the deliberations. Ideally the judge should then question the jurors to the same effect. While the latter was not done here explicitly, absent any indication of misbehavior this failure to inquire does not condemn the conviction.

AFFIRMED.