**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**JUN 5 1998**

**TENTH CIRCUIT**

**PATRICK FISHER**
**Clerk**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

DENNIS R. ABBEY,

Defendant-Appellant.

No. 97-1284
(D.C. No. 95-CR-214-01-N)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **BARRETT**, and **BRISCOE**, Circuit Judges.

Defendant Dennis R. Abbey appeals his convictions and sentences for twelve

criminal offenses arising out of his misconduct while a fiduciary responsible for

overseeing the financial affairs of eighteen incompetent military veterans.  We exercise

jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

Abbey is a resident of Longmont, Colorado, and a veteran of the Vietnam war.  He

began working for Boulder County, Colorado, in July 1974 as a veterans service officer,

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel.  The court generally disfavors the
citation of orders and judgments; nevertheless, an order and judgment may be cited under
the terms and conditions of 10th Cir. R. 36.3.

assisting veterans and their dependents in filing claims. In 1985, Abbey was persuaded by employees of the Veterans Administration (VA), in particular VA attorney John Lancelot, to act as a fiduciary for incompetent veterans. This fiduciary role, which was entirely separate from his position with Boulder County, involved overseeing the financial affairs of veterans who for various reasons were unable to manage their own financial affairs. The VA often appointed banks to act as fiduciaries, but such arrangements did not work well with veterans who had severe emotional problems.

Colorado state law prohibited fiduciaries other than banks or trust companies from having more than five wards, but VA employees occasionally bypassed the law by appointing a fiduciary in name only and then having another person act as de facto fiduciary. Lancelot persuaded Abbey to act as fiduciary for more than five veterans. The VA appointed Abbey's wife as fiduciary for six veterans and appointed Charles Keeran, Abbey's friend, as fiduciary for seven veterans. The primary responsibility of the named fiduciaries was to sign blank checks for Abbey, who acted as de facto fiduciary for all of the veterans.

Abbey did not receive any formal training concerning his fiduciary duties. Lancelot advised Abbey whenever questions arose and effectively acted as Abbey's legal advisor until Lancelot retired. Lancelot specifically advised Abbey to petition in state court to be appointed guardian for several veterans; however, he generally advised Abbey to act as de facto guardian for all of the veterans. In his role as both actual and de facto

fiduciary, Abbey controlled the finances of the eighteen veterans. Abbey received their benefit checks and had discretion to spend the funds in any manner he concluded would benefit the veterans. Abbey was to insure that the veterans had housing, clothing, food, and other basic necessities. He also exercised his discretion to purchase other items for the veterans, such as vehicles and baseball tickets, and he made charitable contributions on behalf of the veterans. Abbey submitted an annual accounting to the VA for each veteran, summarizing how each veteran's funds were spent.

In return for his work as a fiduciary, Abbey was entitled to an administrative fee under Colorado law equal to five percent of each veteran's income. He submitted, at Lancelot's urging, at least one petition for extraordinary fees for additional services. In addition to the regular administrative fee, Abbey also routinely charged the veterans for time he and others spent visiting or caring for the veterans. It is unclear whether any of these charges were submitted for approval in state court.

Beginning in approximately October 1989 (roughly coinciding with Lancelot's absence from work because of cancer and his subsequent retirement), Abbey began to engage in a variety of questionable practices. For example, he asked Margaret Schaefer-Sachs, a licensed social worker, to continue billing veterans for counseling services after she had moved to California. According to Schaefer-Sachs, Abbey told her he was counseling many of the veterans without compensation and it would be a conflict of interest for him to personally submit bills to the veterans for counseling. Abbey called

Schaefer-Sachs on a regular basis to tell her the alleged hours he spent with each veteran and she prepared and submitted corresponding bills to Abbey, as if she had performed the counseling services. Abbey then wrote checks on the veterans' accounts payable to Schaefer-Sachs and deposited the checks in an account she maintained in Colorado. Schaefer-Sachs signed blank checks on her Colorado account and sent them to Abbey so he could withdraw his share (he took $50 of every $60 charged). Between January 1990 and March 1993, approximately $75,000 was deposited in the Colorado account pursuant to this arrangement, of which Schaefer-Sachs received approximately $15,000 and Abbey received the remainder.

Abbey engaged in other uses of the veterans' funds which directly or indirectly benefited him. In 1991, he donated a total of $2,000 from several veterans' accounts to the local Disabled American Veterans (DAV). Abbey was a member and officer of the local DAV and had signature authority over its checking account. Shortly after the donations were made, DAV funds were used to purchase a fax machine which was donated to the office where Abbey worked. Notably, the DAV check for the fax machine was signed by Abbey. Subsequently, Abbey made several donations to the DAV on behalf of several of the veterans totaling approximately $13,000. The DAV used the funds to send Abbey on three trips to Vietnam.

A seventeen-count indictment was returned against Abbey and Schaefer-Sachs on June 15, 1995. Count 1 charged the two with conspiracy to make false statements (18

-4-

U.S.C. §§ 371, 1001, 2); counts 2 through 5 charged Abbey with embezzlement of VA funds (38 U.S.C. § 6101, 18 U.S.C. § 2); counts 6 through 9 charged Abbey with making false statements (18 U.S.C. §§ 1001, 2); counts 10 through 13 charged Abbey with wire fraud (18 U.S.C. §§ 1343, 2); count 14 charged Abbey with money laundering (18 U.S.C. §§ 1956(a)(1)(B)(i), 2); and counts 15 through 17 charged Abbey with making false statements on a tax return (26 U.S.C. § 7206(1)). Schaefer-Sachs pleaded guilty to count 1 and agreed to testify against Abbey. Abbey's motions for judgment of acquittal as to counts 5 and 14 were granted. He was convicted by jury of counts 1, 2, 6 through 9, 11 through 13, and 15 through 17, and was acquitted on the remaining three counts. Abbey was sentenced to 46 months' imprisonment, a $10,000 fine, and three years' supervised release.

II.

**Calculation of loss as to count 1**

The district court concluded the veterans received nothing for the money paid to Abbey and Schaefer-Sachs for the billed counseling services. Accordingly, under U.S.S.G. § 2F1.1(b)(1), the court concluded the loss associated with count 1 was the entire $79,227.46 paid by the veterans for the billed counseling services. Abbey contends he actually performed services for the veterans in exchange for the money and that the value for those services must be subtracted from the total payments. He further contends the court erred in requiring him to prove he actually performed work for the money rather

than requiring the government to prove the opposite.

We review a district court's interpretation of the guidelines de novo and the court's factual findings for clear error, giving due deference to its application of the guidelines to the facts. United States v. Janusz, 135 F.3d 1319, 1324 (10th Cir. 1998). With respect to a district court's determination of a U.S.S.G. § 2F1.1 loss in particular, we apply a clear error standard. United States v. Yarnell, 129 F.3d 1127, 1136 (10th Cir. 1997).

"Loss, under § 2F1.1(b)(1), 'is the value of the money, property, or services unlawfully taken.'" Janusz, 135 F.3d at 1324 (quoting U.S.S.G. § 2F1.1, comment n.7). We interpret "loss" to "mean the 'net value, not the gross value, of what was taken.'" United States v. Pappert, 112 F.3d 1073, 1079 (10th Cir. 1997) (quoting United States v. Gennuso, 967 F.2d 1460, 1462 (10th Cir. 1992)). Accordingly, in cases where a victim of fraud has received something of value from the defendant, the net value is determined by subtracting the value received by the victim from the gross value of what was fraudulently taken. However, we have not required a sentencing court to factor in "money subsequently returned to victims." Id. Because amounts of loss over $2,000 increase a defendant's base offense level for crimes involving fraud and deceit, the government bears the burden of proof on the loss amount. Yarnell, 129 F.3d at 1136.

To meet its burden of proof on the amount of loss issue, the government presented evidence indicating the veterans paid a total of $79,227.46 to Schaefer-Sachs and Abbey pursuant to the fraudulent billing scheme they created and executed. The government

also incorporated the evidence presented at trial, which included testimony from several veterans suggesting they received little or no counseling from either Abbey or Schaefer-Sachs. Based upon this evidence, as well as the fraudulent nature of the billing scheme itself, the government argued the veterans received nothing of value for their money. Abbey attempted to rebut this evidence by presenting exhibits and testimony indicating he performed $80,245.12 worth of services under Schaefer-Sachs' name and performed 2483.5 hours of work for the veterans for which he was not compensated.

In finding the amount of loss associated with count 1 was $79,227.46, the district court rejected entirely the evidence presented by Abbey, concluding it was "palpably false" and "unreliable in every respect." The court challenged Abbey's methodology for reconstructing the number of hours of work he performed for the veterans, noted there were inconsistencies between Abbey's trial testimony and sentencing testimony, noted there were numerous inconsistencies in documentation Abbey submitted at sentencing, and emphasized Abbey knew how to properly bill for services, including any counseling services he may have performed. Ultimately, the court found "[n]either Abbey, Schaefer[-Sachs], nor anyone else really gave the veterans anything of value for this money." Record I at 56.

Based upon our review of the record, we conclude the district court's findings on this issue are not clearly erroneous. The amount of money paid by each veteran pursuant to the fraudulent billing scheme is essentially uncontroverted. Thus, the only factual issue

for purposes of determining the net value of the loss is whether the veterans received anything of value in return for their money. Critical to this issue was Abbey's credibility. In light of the nature of the scheme itself, and in light of Abbey's implausible explanation for engaging in the scheme (i.e., to keep track of how many hours of supervision he received from Schaefer-Sachs so he could become a licensed counselor), we believe it was entirely appropriate for the district court to reject outright Abbey's testimony and evidence on this point and conclude the veterans received nothing of value for their money.

We also find no merit to Abbey's complaint that the district court shifted the burden of proof to him on the amount of loss. During the sentencing hearing, the court clearly indicated the government bore the burden of proof on the amount of loss with respect to count 1. Record XI at 3039-40 ("the law is pretty clear that net loss is the Government's burden").

**Obstruction of justice enhancement**

In calculating Abbey's sentence, the district court enhanced his offense level by two levels pursuant to U.S.S.G. § 3C1.1 for obstruction of justice. In imposing this enhancement, the court found Abbey willfully prepared and filed materially false information with the court concerning the amounts of loss associated with the conspiracy and the tax-related counts in an attempt to reduce his overall sentence. With respect to

the exhibit Abbey prepared and filed concerning the amount of loss related to count 1, the

court found "repeated patterns of falsity throughout the exhibit," including

> (a) repeated billing for time spent on veterans' affairs, when the time could not possibly have been spent--because Mr. Abbey was touring Vietnam; (2) repeated billing of hours for time spent on veterans' affairs, when the time could not have been spent--because Mr. Abbey was at a series of out-of-state conferences in this country; and (3) billing for time spent [on] the affairs of multiple veterans on the same day, resulting in implausible twenty-hour days or impossible days in excess of twenty-four hours.

Record I at 54. On appeal, Abbey contends the court erred in imposing this obstruction of

justice enhancement. According to Abbey, any errors in the sentencing exhibits he

prepared were simply mistakes and were not the result of any intent to willfully disobey

or disregard the law.

In reviewing a district court's decision to impose an obstruction of justice

enhancement pursuant to § 3C1.1, we review the underlying factual findings for clear

error and the legal conclusions de novo. United States v. Shumway, 112 F.3d 1413, 1424

(10th Cir. 1997). Section 3C1.1 provides for a two-level upward adjustment "[i]f the

defendant willfully obstructed or impeded, or attempted to obstruct or impede, the

administration of justice during the investigation, prosecution, or sentencing of the instant

offense." Obstruction of justice includes "producing . . . a false . . . document or record

during an official investigation or judicial proceeding." U.S.S.G. § 3C1.1, comment n.

3(c).

After reviewing the record on appeal, we conclude the district court's factual

findings on this issue are not clearly erroneous.[1]  Although it is conceivable a large

exhibit summarizing detailed time expenditures may contain innocent mistakes, the

inconsistencies in the exhibits produced by Abbey and submitted to the district court were

so glaring it was entirely reasonable for the court to conclude they were "palpably false"

and "unreliable," and were the product of a willful attempt to "mislead[] the court into

minimizing defendant's sentence."  Record I at 54, 69.


**Excusing prospective juror**

Abbey contends the district court abused its discretion and violated the Jury

Selection and Service Act of 1968, 28 U.S.C. §§ 1861-77, by granting the government's

challenge for cause and excusing Thanh Kay Vu from the jury panel.  According to

---

[1]  Abbey makes a passing reference in his opening brief to the appropriate standard of proof on this issue.  In particular, he points to language in Application Note 1 to the applicable version of § 3C1.1 which states: "In applying this provision in respect to alleged false testimony or statements by the defendant, such testimony or statements should be evaluated in a light most favorable to the defendant."  Based on this language, he contends the proper standard of proof is "clear and convincing" rather than "preponderance of the evidence."  Although a few circuits have apparently agreed a "clear and convincing" standard applies when a sentencing court is relying on a defendant's perjury as a basis for the obstruction of justice enhancement, see, e.g., United States v. Walsh, 119 F.3d 115, 121 (2d Cir. 1997); United States v. Gaviria, 116 F.3d 1498, 1518 (D.C. Cir. 1997), cert. denied, 118 S.Ct. 865 (1998), this circuit has not decided the issue.  In all other contexts, we have held the appropriate standard of proof for obstruction of justice enhancement is a preponderance of the evidence.  United States v. Pelliere, 57 F.3d 936, 938 (10th Cir. 1995).  Ultimately, we find it unnecessary to decide whether a "clear and convincing" standard of proof applies in cases involving a defendant's perjury because the enhancement in this case is not based on defendant's testimony, but rather on false documents he prepared and submitted to the court.

defendant, "the scope of voir dire was inadequate to permit the court to make an informed judgment as to whether Mr. Vu could sit as an impartial juror," and the court "made no attempt to elaborate on or to reiterate the jury instruction regarding reasonable doubt or the presumption of innocence as was suggested by defense counsel." Br. at 26, 28.

A trial court's decision to strike a juror for cause is reviewed on appeal for abuse of discretion. United States v. Contreras, 108 F.3d 1255, 1265 (10th Cir.), cert. denied, 118 S.Ct. 116 (1997). Any questions involving interpretation of the Jury Selection and Service Act of 1968 are reviewed de novo. Id. "Under the Jury Selection and Service Act of 1968, . . . any person is qualified to serve on grand and petit juries in the district court unless, inter alia, that person '(2) is unable to read, write, and understand the English language with a degree of proficiency sufficient to fill out satisfactorily the juror qualification form; [or] (3) is unable to speak the English language.'" United States v. Dempsey, 830 F.2d 1084, 1087 (10th Cir. 1987) (quoting 28 U.S.C. § 1865(b)(2) and (3)). "[A] juror who fails to meet the statutory qualifications is subject to challenge 'for cause.'" 2 Charles Alan Wright, Federal Practice and Procedure § 383, at 361 (2d ed. 1982).

There is no indication Vu was unable to satisfactorily complete the juror qualification form and it appears he met the statutory requirement set forth in § 1865(b)(2). Accordingly, the only conceivable basis for striking him for cause would have been an inability "to speak the English language." In Dempsey, we acknowledged

the phrase "'speak the English language' is often used to mean 'speak and understand spoken English,'" but refused to adopt this construction of the phrase for purposes of applying the Jury Selection and Service Act. 830 F.2d at 1087. Instead, we applied the phrase literally to refer only to a person's speaking ability. Under Dempsey's construction of § 1865(b)(3), it appears Vu satisfied the Act because he was able to speak the English language when questioned by the court.

Assuming, arguendo, the district court abused its discretion in striking Vu from the panel for cause, Abbey is entitled to a new trial only if he can demonstrate actual prejudice resulting from the error. See United States v. Mills, 987 F.2d 1311, 1314 (8th Cir. 1993); United States v. Griley, 814 F.2d 967, 974 (4th Cir. 1987) (improper striking of prospective juror for cause subject to harmless error analysis). Notably, Abbey has not even attempted to argue actual prejudice and, after carefully reviewing the entire trial transcript, we are not convinced any prejudice resulted from Vu's removal.

Although Abbey attempts to argue the district court's dismissal of Vu resulted in violations of the equal protection component of the Fifth Amendment and the fair cross-section requirement of the Sixth Amendment, we are not convinced such challenges are applicable where, as here, a potential juror is stricken for cause. See United States v. Elliott, 89 F.3d 1360, 1364-65 (8th Cir. 1996) (concluding "Batson applies only to peremptory strikes"), cert. denied, 117 S.Ct. 963 (1997); United States v. Blackman, 66 F.3d 1572, 1575 n.3 (11th Cir. 1995) (same); United States v. Bergodere, 40 F.3d 512,

515-16 (1st Cir. 1994) ("defendant must show that the challenge was peremptory rather than for cause" to invoke Batson). As the Eighth Circuit noted in Elliott, the extrapolation of the Batson[2] framework to for-cause strikes "fails to recognize that peremptory strikes, for which no reasons need be given (absent a Batson challenge), are different from challenges for cause, which by definition require a showing of cause." 89 F.3d at 1365. Even assuming, for purposes of argument, that Abbey's Fifth and Sixth Amendment challenges are proper, we are not convinced a trial court's abuse of discretion in striking a potential juror for cause, in and of itself, is sufficient to establish a prima facie violation of either the Fifth or the Sixth Amendment. See generally United States v. Gault, ___ F.3d ___, 1998 WL 177982 at *2 (10th Cir. 1998) (outlining requirements to establish prima facie violation of the Sixth Amendment); Contreras, 108 F.3d at 1268 (outlining requirements to establish prima facie violation of Fifth Amendment equal protection clause). Any error on the part of the district court in dismissing Vu for cause is harmless and does not entitle Abbey to a new trial.

**Trial judge's conduct**

Abbey alleges that, during trial, the trial judge was openly hostile toward him, his defense counsel, and several defense witnesses, inappropriately curtailed testimony from Abbey and one of his defense witnesses (Dr. Carl Sternberg), and asked argumentative

---

[2] Batson v. Kentucky, 476 U.S. 79 (1986).

questions of witnesses and made unnecessary comments during testimony that conveyed his own impressions to the jury. Taken together, Abbey contends, these actions deprived him of his right to a fair trial.

"A charge of misconduct by a trial judge 'should not be lightly made and once made, should not be casually treated by a reviewing court.'" United States v. Welch, 745 F.2d 614, 620 (10th Cir. 1984) (quoting United States v. Cardall, 550 F.2d 604, 606 (10th Cir. 1976)). Charges of partiality or misconduct on the part of the trial judge "should be judged not on an isolated comment or two, but on the record as a whole." United States v. Polito, 856 F.2d 414, 418 (1st Cir. 1988). A trial judge is "'the governor of [a] trial for the purpose of assuring its proper conduct.'" Id. (quoting Quercia v. United States, 289 U.S. 466, 469 (1933)). It is "beyond dispute" that a trial judge has authority to question witnesses. United States v. Albers, 93 F.3d 1469, 1485 (10th Cir. 1996). In particular, such questioning is appropriate when necessary to clarify testimony for the court and jury, or to correct misstatements by witnesses. See id. at 1486. "[H]owever, . . . in exercising this power a judge must take care not to create the appearance that he or she is less than totally impartial." Id. at 1485. In addition to questioning witnesses, a trial court also has "broad discretion 'to comment reasonably upon the evidence.'" United States v. Pearson, 798 F.2d 385, 387 (10th Cir. 1986) (quoting United States v. Baker, 638 F.2d 198, 203 (10th Cir. 1980)). Again, however, the trial court must "'be[] careful not to become an advocate for any of the parties.'" Id.

Before directly addressing Abbey's arguments, we note he did not raise contemporaneous objections to some of the misconduct now alleged on appeal. Although he did move for a mistrial at one point in the proceedings, the trial judge's alleged improper questioning of witness Kent Olsen occurred the day after the motion for mistrial. Similarly, the alleged improper comments made during Abbey's own testimony occurred two days after the motion for mistrial had been denied. Because Abbey never renewed his motion for mistrial, any alleged misconduct that occurred after the denial of his motion for mistrial is subject to review only for plain error. See Fed. R. Crim. P. 52(b).

Having reviewed the entire trial transcript, we conclude the trial judge's actions did not deprive Abbey of the right to a fair trial. It is without question the trial judge required counsel to ask proper questions and required witnesses to respond only to questions asked by counsel. In addition, the judge sometimes questioned witnesses from both sides and occasionally commented on evidence or exhibits. However, based on the entire record, it is clear he did not favor the prosecution. Moreover, the record demonstrates the judge was generally cordial to witnesses from both sides, and attempted to prevent any disputes that might harm Abbey in front of the jury. See, e.g., Record VIII at 2086 (out of presence of jury, trial judge instructed defense counsel to have Abbey watch his demeanor and responses during cross-examination so the judge would not have to interject and to "avoid hopefully confrontations in front of the jury").

**Sufficiency of evidence**

Abbey contends the evidence presented at trial was insufficient to support his convictions on counts 2, 6, and 7. We review de novo the question of whether the evidence at trial was sufficient. United States v. Ivy, 83 F.3d 1266, 1284 (10th Cir. 1996). Viewing the evidence and the reasonable inferences therefrom in the light most favorable to the government, we ask whether a reasonable jury could find the defendant guilty beyond a reasonable doubt. We will reverse only if we conclude no reasonable jury could have reached the disputed verdict. Id.

*Count 2--embezzlement of VA benefit funds.* Count 2 of the indictment charged Abbey with violating 38 U.S.C. § 6101 and 18 U.S.C. § 2 by embezzling and misappropriating funds held by him in a fiduciary capacity for veteran Grant Totten. More specifically, the count charged Abbey with depositing into his own account a U.S. Treasury check that was a refund to Totten of money kept in a patient fund account at a VA medical center. On appeal, Abbey argues the evidence was insufficient to support his conviction on this count because it was uncontroverted he was never appointed as fiduciary for Totten's estate.

At the time the embezzlement/misappropriation occurred, the controlling statute, 38 U.S.C. § 6101(a), provided:

> Whoever, being a guardian, curator, conservator, committee, or person legally vested with the responsibility or care of a claimant or a claimant's estate, or any other person having charge and custody in a fiduciary capacity of money heretofore or hereafter paid under any of the laws administered by

-16-

the Department for the benefit of any minor, incompetent, or other beneficiary, shall lend, borrow, pledge, hypothecate, use, or exchange for other funds or property, except as authorized by law, or embezzle or in any manner misappropriate any such money or property derived therefrom in whole or in part and coming into such fiduciary's control in any manner whatever in the execution of such fiduciary's trust, or under color of such fiduciary's office or service as such fiduciary, shall be fined in accordance with title 18 or imprisoned not more than five years, or both.

To prove a violation of § 6101(a), the language of the statute itself suggests the government must demonstrate, in part, that the defendant was either "legally vested with the responsibility or care of a claimant or a claimant's estate," or was in "charge and custody in a fiduciary capacity of money . . . paid under any of the laws administered by the [VA] for the benefit of any minor, incompetent, or other beneficiary." Although the statute does not define the term "fiduciary capacity," Black's Law Dictionary indicates a person acts in a "fiduciary capacity" when

> the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.

Black's Law Dictionary 625 (6th ed. 1990). Recently, the Second Circuit approved this very definition of "fiduciary capacity" in concluding a defendant was properly convicted of violating § 6101, even though he had never personally signed a fiduciary agreement with the VA. United States v. Zyskind, 118 F.3d 113, 117 (2d Cir. 1997) (defendant, administrator of home for handicapped adults, was placed in relationship of fiduciary with respect to funds paid by VA to home for care of veteran, even though defendant did

-17-

not personally sign fiduciary agreement with VA).

Here, the evidence clearly indicates Abbey was acting in a "fiduciary capacity" toward Totten and his estate when he cashed the government check. Although Abbey had never been officially appointed as fiduciary for Totten, his friend Keeran was the appointed fiduciary for Totten, and, under the arrangement devised by Abbey and VA attorney Lancelot, Abbey acted as Totten's de facto fiduciary. Accordingly, we conclude the evidence presented at trial was sufficient to support Abbey's conviction on Count 2.

*Counts 6 and 7--false statements regarding Fred Ball's estate.* Counts 6 and 7 of the indictment each charged Abbey with violating 18 U.S.C. § 1001 by making false statements to the VA regarding the estate of veteran Fred Ball. Count 6 alleged that on or about January 28, 1991, Abbey completed and submitted to the VA a form entitled "Statement in Support of Claim," that fraudulently indicated a truck had been purchased for Fred Ball and his estate was below $20,000.[3] Count 7 alleged that on or about May 10, 1991, Abbey submitted to the VA an interim accounting on behalf of Ball that falsely indicated a Ford Explorer costing $24,915.16 had been purchased for Ball. On appeal, Abbey contends his convictions on these two counts must be reversed because the government did not produce sufficient evidence that any of the statements in the two

_____

[3] At that time, there was in effect the "$25,000 rule," which compelled the VA to cease paying benefits to any veteran whose estate exceeded $25,000. According to the evidence presented at trial, it was apparently common for VA fiduciaries to spend down their veterans' accounts to avoid application of the rule.

documents were "material." With respect to Count 6, Abbey argues there was nothing in the January 28, 1991, document submitted to the VA that was "material" because "it had no bearing on whether the VA would or would not continue benefits payments [for Ball] until March 31, 1991." Br. at 43. Similarly, as to Count 7, Abbey contends there was nothing in the May 10, 1991, accounting submitted to the VA that was "material" because, even though a Ford Explorer had not been purchased for Ball, a Ford Ranger truck had been purchased for him. According to Abbey, either vehicle purchase was sufficient to drop Ball's estate below $25,000 and prevent the VA from stopping benefit payments to Ball. Thus, Abbey argues, the statement regarding the purchase of the Explorer did not cause the VA to do something it would not have otherwise done had it known the true facts.

Abbey himself acknowledges that, in the context of 18 U.S.C. § 1001, we have consistently held a "'false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the tribunal in making a determination required to be made.'" United States v. Meuli, 8 F.3d 1481, 1485 (10th Cir. 1993) (quoting United States v. Brittain, 931 F.2d 1413, 1415 (10th Cir. 1991)). Actual reliance on the false statement is unnecessary; all that need be shown is it "has the capacity to influence the decision." United States v. Haddock, 956 F.2d 1534, 1550 (10th Cir. 1992) (construing similar materiality provision in 18 U.S.C. § 1014).

With respect to count 6, it is apparent the statement had the capability of

influencing the VA. More specifically, because the statement falsely indicated a vehicle had been purchased for Ball and the total value of his estate was less than $25,000, the statement had the capability of influencing the VA to not implement the $25,000 rule and cease benefit payments to Ball. Moreover, evidence presented at trial indicated the VA in fact acted upon the false statement and sent a follow-up letter to Abbey on February 12, 1991, indicating it would not cease benefit payments to Ball in light of the information submitted (i.e., the false statement). Thus, the false statement at issue in count 6 was clearly "material" for purposes of § 1001.

Similarly, the false statement at issue in count 7, i.e., that a Ford Explorer had been purchased for Ball, had the capability of influencing, and in fact did influence, the VA. Joann Roybal, an estate analyst for the VA, testified at trial that the VA regularly audited accountings submitted by fiduciaries to ensure the benefits of incompetent veterans were administered properly. In light of this testimony, we believe it is reasonable to conclude the false statement at issue in count 7 prevented the VA from properly auditing the accounting submitted by Abbey and from ensuring that Ball's VA benefits were administered properly. In particular, the VA was falsely persuaded to believe Ball was the owner of a $25,000 vehicle when, in fact, he was the owner of a $15,000 vehicle, and the value of his estate (excluding the vehicle) was $10,000 less than it actually was. Accordingly, we conclude the statement at issue in count 7 was "material."

**Amendment of count 1 by expanded language in instruction**

Abbey contends the district court impermissibly amended count 1 of the indictment (i.e., the conspiracy count) when it instructed the jury it could convict him of conspiracy if it found he conspired with any person, whether named in the indictment or not. As noted by Abbey, count 1 of the indictment listed only Abbey and Schaefer-Sachs as conspirators, and made no mention of any other unnamed conspirators.

As Abbey acknowledges in his opening brief, this issue is subject to review for plain error since no objection was made to the jury instructions at trial. Fed. R. Civ. P. 52(b); see United States v. Galbraith, 20 F.3d 1054, 1057 (10th Cir. 1994). Plain error affects the defendant's right to a fair and impartial trial, and it must have been both obvious and substantial. Id.

"[T]he Fifth Amendment forbids amendment of an indictment by the court, whether actual or constructive." United States v. Wacker, 72 F.3d 1453, 1474 (10th Cir. 1995). A variance between the indictment and the jury instructions "becomes a constructive amendment if the evidence presented at trial and the instructions raise the possibility that a defendant may have been convicted on a charge other than that alleged in the Indictment." United States v. Davis, 55 F.3d 517, 520-21 (10th Cir. 1995); see also United States v. Williamson, 53 F.3d 1500, 1513 (10th Cir. 1995) (a constructive amendment is a type of variance because it modifies an essential element of the offense charged).

-21-

Here, a review of the trial transcript demonstrates there was no constructive amendment of the indictment. Although the district court's jury instructions mentioned the possibility of conspirators not listed in the indictment, there was simply no evidence of any such conspirators' involvement in the acts alleged in count 1. In instructing the jury on count 1, the district court stated:

> The government must prove that the defendant, Dennis R. Abbey, and at least one other person knowingly and deliberately arrived at some type of agreement or understanding that they, and perhaps others, would violate some laws by some means of some common plan or course of action as alleged particularly in Count 1 of the indictment.

Record IX at 2548. The court further instructed that the acts and statements of Schaefer-Sachs could be considered by the jury in determining whether the government had proven count 1. Count 1 of the indictment included the following language:

> 3. It was part of the conspiracy that defendants, DENNIS R. ABBEY and MARGARET J. SCHAEFER, made and caused to be made and filed yearly accountings that listed MARGARET J. SCHAEFER as receiving money for providing counseling services to the veterans when, in fact, she did not provide the counseling services as listed in the accountings and did not receive the money as payment as listed in the accountings.
> 4. In furtherance of this conspiracy and to effect the objects of the conspiracy, one or more of the defendants committed and caused to be committed one or more of the following overt acts, among others:
> (a.) DENNIS R. ABBEY submitted and caused to be submitted accountings for sixteen of the eighteen qualified veterans . . ., which stated that MARGARET J. SCHAEFER provided counseling services in the aggregate amount of approximately $83,980.00, when, in fact, she did not provide the counseling services as described.
> (b.) MARGARET J. SCHAEFER allowed DENNIS R. ABBEY to use her name on the accountings so that it appeared to the VA that the money was paid to her for providing counseling services that, in fact, she had not performed.

(c.) MARGARET J. SCHAEFER provided DENNIS R. ABBEY with deposit slips and checks that were signed by her but otherwise in blank for her account # 2836459 at FirstBank of South Longmont, N.A. in Longmont, Colorado, the accounts of which were insured by the Federal Deposit Insurance Corporation. This financial institution became a branch of FirstBank of North Longmont, N.A. on December 10, 1991.

(d.) Using the deposit slips provided by MARGARET J. SCHAEFER, DENNIS R. ABBEY deposited checks drawn on the accounts of these 16 veterans in the approximate amount of $76,827.46 into MARGARET J. SCHAEFFER's account.

(e.) DENNIS R. ABBEY withdrew approximately $62,660.00 from this account by completing and negotiating the checks which MARGARET J. SCHAEFER provided him.

(f.) MARGARET J. SCHAEFER received and retained in this account for her use approximately $14,167.46.

Record I at 6-7. The only evidence presented to the jury which would pertain to the acts described in the instructions on count 1 which incorporated the common plan or course of action set forth in count 1 of the indictment involved only one co-conspirator and that was Schaefer-Sachs. Thus, there was no possibility Abbey was convicted on a charge other than that alleged in count 1 of the indictment.

III.

The judgment of the district court is AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge
